## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

SALLY DIETERICH

      Plaintiff,

v.

CITY OF BOULDER

      Defendant.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiff Sally Dieterich for her Complaint states:

## INTRODUCTION

1.      This is an employment discrimination and retaliation suit brought by the Assistant to the Director of the Parks and Recreation Department of the City of Boulder who was harassed and discriminated against due to her sexual orientation in violation of state and federal law.  Plaintiff was discriminated and retaliated against after she told her secondary supervisor, the Deputy Director of the Parks and Recreation Department, that she was a newly married lesbian.  She was further retaliated against after she complained of the pervasive discriminatory behavior to the Human Resources Department.  Plaintiff asserts claims against the City of Boulder for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and of retaliation against her for having engaged in protected activity

1

by objecting to her harassment, also in violation of Title VII. Plaintiff further asserts claims of discrimination and retaliation under the Colorado Anti-discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-401 and 402, as amended.

## PARTIES

2. Plaintiff Sally Dieterich is a resident of the State of Colorado.

3. Defendant City of Boulder is a municipality in the State of Colorado.

4. The City of Boulder's Parks and Recreation principal office is located at 3198 Broadway in Boulder, CO 80304.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367, and specifically under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful were committed in the District of Colorado.

7. At all relevant times, Defendant City of Boulder was covered by the definitions of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII and in Colo. Rev. Stat. § 24-34-401(3) of the Colorado Anti-Discrimination Act.

## SPECIFIC ALLEGATIONS

8. Sally Dieterich is a City of Boulder employee who identifies as a lesbian.

9. Ms. Dieterich was hired by the City of Boulder in March 2007 as the Assistant to the Director of Parks and Recreation and Parks and Recreation Advisory Board Secretary.

10.     Her job duties included providing administrative assistance to the Parks & Recreation Director, Parks and Recreation Division Heads, Interim Director and Deputy Director (2014-2015).  As such, Ms. Dieterich provided administrative assistance to Parks and Recreation Director Kirk Kincannon from 2009 through 2014, as well as the previous director from 2007 to 2009.

11.     Mr. Kincannon resigned his position and Jeff Dillon, Parks Superintendent, became the Interim Parks and Recreation Director in 2014.

12.     Ms. Dieterich began providing support to Mr. Dillon in mid-January 2014.

13.     The City of Boulder conducted its search for a Deputy Director in the spring of 2014 and hired Yvette Bowden for the position.  Ms. Bowden began work in June 2014.

14.     Ms. Bowden and Ms. Dieterich initially had a warm and friendly professional relationship.

15.     Ms. Bowden utilized Ms. Dieterich's assistance for duties such as setting appointments, booking conferences, managing her calendar, greeting guests, receiving calls and emails for both the Director and Deputy Director, and even scheduling Ms. Bowden's daughter for summer camp sessions.

16.     In the first months of working together, Ms. Bowden frequently told Ms. Dieterich that they "made a great team" and gave her high fives to express her appreciation.

17.     Ms. Bowden even suggested that she and Ms. Dieterich open the shade covering the window between their offices so they could "better connect."

18.     In October 2014, Ms. Dieterich was invited to serve on a panel of five participants during an LGBT Ally training held by the City for all of its Directors.

19. Mr. Dillon, Interim Parks and Recreation Director, elected not to attend the panel, even though most of the other City Directors and City Manager attended.

20. Deputy Director Bowden also did not attend.

21. Following the training, Ms. Dieterich returned to the office and told Ms. Bowden that the training had been successful.

22. Ms. Bowden responded with a flat "that's nice" and promptly left the office.

23. Ms. Dieterich found Ms. Bowden's response unusual given their generally warm interactions.

24. Excited about the success of the LGBT Ally training, later that day Ms. Dieterich shared with Ms. Bowden that she had recently married her female partner of 25 years.

25. Ms. Bowden did not respond and quickly turned and walked away.

26. From this point forward, Ms. Bowden and Ms. Dieterich's working relationship changed drastically.

27. Ms. Bowden was no longer warm towards Ms. Dieterich and began treating her differently from other City employees.

28. Shortly after Ms. Dieterich told Ms. Bowden that she had married her partner, Ms. Bowden told Ms. Dieterich to stop assisting her, even though Ms. Dieterich had been Ms. Bowden's assistant since her hire in June 2014.

29. Ms. Bowden began avoiding eye contact with Ms. Dieterich and only spoke to her when necessary.

30. Ms. Bowden's behavior was cold and a departure from how she had treated Ms. Dieterich prior to their conversation about Ms. Dieterich's marriage.

31.     On November 18, 2014, Ms. Bowden and City of Boulder Human Resouces Interim representative Rick DelaCastro informed Ms. Dieterich that she was accused of conspiring with an unnamed City of Boulder employee from an unnamed City of Boulder department to steal gasoline from the City of Boulder Fleet Services and that Ms. Dieterich was being placed on paid administrative leave effective immediately.

32.     During this meeting, Ms. Bowden and Mr. DelaCastro told Ms. Dieterich that this accusation would most likely be turned over to the City of Boulder Police Department.

33.     Ms. Bowden told Plaintiff to turn over her entry badge, leave her desk drawers unlocked, and exit the building immediately.

34.     Ms. Bowden went so far as to personally escort Plaintiff out of the office past her coworkers, which was unnecessary and humiliating.

35.     To date, Ms. Bowden has never interviewed Ms. Dieterich regarding the accusation.

36.     After numerous requests for information via email and telephone, on December 5, 2014, Ms. Dieterich finally received an email response from Michelle Havens in Human Resources stating that the reason for her being placed on paid administrative leave was due to discrepancies in fuel records at City of Boulder Fleet Services and that the investigation was on-going.

37.     On December 8, 2014, Ms. Bowden emailed Plaintiff a written notice in which she requested Plaintiff's attendance at a due process hearing on December 12, 2014, which was subsequently rescheduled to December 23, 2014.

38.     In the afternoon on December 12th, Ms. Dieterich received a call from City of Boulder Police Officer Amie Roth, requesting an interview.  Officer Roth scheduled the interview for December 21, 2014 at the City of Boulder Police Department.

39.     On December 21, 2014, Ms. Dieterich, her wife Leigh Rosenblum, and criminal attorney Lou Rubino met with Officer Amy Roth at the City of Boulder Police Department. At this meeting, Ms. Dieterich was video-recorded, audio-recorded, and read her Miranda rights. Ms. Dieterich and Ms. Rosenblum supplied Officer Roth with numerous pages of evidence detailing inconsistencies in the FuelMaster System, utilized by the City of Boulder and numerous other municipalities, to track fuel consumption, mileage, and permit city vehicles to refuel.

40.     During this meeting, Officer Roth said the charges against Ms. Dieterich appeared to have numerous anomalies after Ms. Dieterich provided evidence that the odometer readings reported were frequently non-sequential.

41.     On December 23, 2014, at her City of Boulder due process hearing, Ms. Dieterich presented evidence detailing possible failures in the Fuelmaster System at the City of Boulder after reviewing numerous audit reports revealing failures of the FuelMaster system in other cities.

42.     On December 29, 2014, Officer Roth called/emailed Ms. Dieterich and told her that the accusations against her were unfounded and that she was closing Ms. Dieterich's case.

43.     Ms. Roth indicated that she would communicate this information to the City of Boulder immediately.

44.     From December 23, 2014 to January 5, 2015, Ms. Dieterich did not receive any communication from the City of Boulder. On January 5, 2015, Ms. Dieterich received a notice determination from Yvette Bowden requesting her return to work on January 12, 2015.

45.     The notice stated that there was "insufficient evidence" to continue Ms. Dieterich's leave and the case was closed. The notice also required Ms. Dieterich to attend a re-entry meeting at

City of Boulder Human Resources on January 8, 2015 and required Ms. Dieterich to return to work on January 12, 2015 or consider herself terminated.

46.     At the January 8, 2015 meeting, Ms. Dieterich, Ms. Bowden, and Business Services manager Kady Doelling were present. At that meeting Ms. Dieterich was told her work location was being moved to the Iris Center front desk.

47.     Ms. Doelling also began to treat Ms. Dieterich with hostility following the January 8th meeting. Prior to this, Ms. Dieterich and Ms. Doelling had a friendly working relationship.

48.     On January 12, 2015, Ms. Dieterich returned to work.

49.     Shortly after returning to work on January 12th, Ms. Bowden removed Ms. Dieterich from her office in the Director's Suite—the one she had occupied for nearly eight years—and relocated her to the front desk with a Boulder Municipal Employees Association clerk/receptionist, Kim Moore.

50.     Ms. Bowden said that they had planned the move prior to Ms. Dieterich's leave and that the move would provide the department with a "full service front desk."

51.     From January 12, 2015, Ms. Dieterich no longer had her own desk, but instead shared a counter with Ms. Moore in a public area with no private office as she previously had for nearly eight years.

52.     In addition, Ms. Dieterich was unable to answer the main Parks and Recreation phone line for 2 to 3 months because her phone extension did not include the City of Boulder main line.

53.     The main Parks and Recreation phone line was only attached to Ms. Moore's phone.

54.     No other employee with Ms. Dieterich's seniority had been similarly relocated during this time period.

55. To Ms. Dieterich's knowledge, her previous desk in the Director's Suite remains unoccupied.

56. When Ms. Dieterich asked Ms. Bowden why the City had chosen to move her rather than the two other administrative specialists, Ms. Bowden refused to answer the question.

57. Ms. Doelling met with Ms. Dieterich on a biweekly basis. At each meeting, Ms. Doelling berated Ms. Dieterich for her posture and on one occasion told Ms. Dieterich that if she had a doctor's appointment of an undetermined length, she would not be permitted to take a full sick day, as every other employee was allowed. Instead, Ms. Doelling told Ms. Dieterich that she had to divide her time into "drive time," "sick time," and "vacation time." Ms. Dieterich felt anxious during each of these meetings.

58. Furthermore, Ms. Bowden told Ms. Dieterich that, although she is the Parks and Recreation Advisory Board ("PRAB") Secretary, she would no longer be permitted to attend board meetings or record meetings as had been her duty for nearly eight years.

59. Although Ms. Dieterich's purchasing card has the highest daily limit of any other employee in the Department, she was stripped of the purchasing duties she previously held.

60. Most of Ms. Dieterich's other board duties related to drafting agendas, scheduling meetings, and managing board communications were also reassigned to others shortly after she returned to work.

61. Ms. Bowden also stripped Ms. Dieterich of all support functions to the Director and Deputy Director, including access to Ms. Bowden's calendar, despite this being an essential function of Ms. Dieterich's position.

62.     Although conference and hotel schedulings for the directors were previously part of Ms. Dieterich's core responsibilities, these tasks were delegated to other employees after Ms. Dieterich returned to work on January 12, 2015.

63.     Due to the high level of stress and increasingly severe conduct Ms. Dieterich was experiencing, she filed a formal sexual orientation discrimination and retaliation complaint with Michelle Havens in Human Resources on February 2, 2015.

64.     In the complaint, Ms. Dieterich alleged that Ms. Bowden discriminated against her based on her sexual orientation by implementing drastic and negative changes to her position, position description, work location, and duties after Ms. Bowden learned of Ms. Dieterich's marriage to a woman.

65.     After Ms. Dieterich filed her complaint with the City of Boulder Human Resources Department, Ms. Bowden's behavior became even worse.

66.     Ms. Bowden ceased communicating with Ms. Dieterich during this time.

67.     For example, Ms. Bowden often brought tasks and paperwork to Ms. Moore and asked Ms. Moore to give them to Ms. Dieterich, even though Ms. Dieterich was present and sitting only a few feet away from Ms. Moore.

68.     Ms. Bowden also asked Ms. Moore to schedule staff meetings, even though Ms. Dieterich held authorization to all city room calendars and Ms. Moore did not.

69.     Ms. Dieterich's job designation is Administrative Specialist II, which is the title of all of the other administrative assistants at her pay grade.

70.     A public title is the job title that city employees operate under when communicating with City officials and staff.

71. On or around January 14, 2015, Ms. Bowden told Ms. Dieterich, as she pointed her finger close to Ms. Dieterich's face, that Ms. Dieterich is not the Assistant to the Director and that she is never to use that title again.

72. Ms. Bowden went on to tell Ms. Dieterich aggressively that she must use the title "Administrative Specialist" instead. Ms. Dieterich asked why and Ms. Bowden refused to answer.

73. Ms. Dieterich's public title was Assistant to the Director/PRAB Secretary for the nearly eight years that she has worked at the Boulder Parks and Recreation Department.

74. The use of Ms. Dieterich's title was necessary due to the nature of her work and the positions of the people she frequently dealt with (directors, board members, city council, visitors, the public, etc.).

75. Ms. Dieterich's former directors uniformly asked her to use the title "Assistant to the Director/PRAB Secretary."

76. On February 26, 2015, Ms. Dieterich met with City of Boulder Human Resources Manager Michael Clasen to review Ms. Dieterich's sexual orientation discrimination complaint.

77. Several days later, Mr. Clasen notified Ms. Dieterich via telephone that her complaint was unfounded. However, no one was interviewed regarding Ms. Dieterich's allegations except Ms. Bowden.

78. On March 3, 2015, Ms. Dieterich came to work and found that her nameplate had been removed from her office in the director's suite and placed in her work mailbox.

79. Ms. Dieterich was surprised to find her nameplate in her mailbox, given that she was still an active employee with the City of Boulder.

80.     On or about July 15, 2015, Ms. Dieterich was diagnosed with breast cancer.

81.     Ms. Dieterich took authorized medical leave under the Family Medical Leave Act (FMLA) from the City of Boulder around September 25, 2015 as she was unable to perform the essential functions of her job.

82.     On October 29, 2015, Ms. Dieterich returned her Leave of Absence form via email to Human Resources Employees Pam Ungaro and Kylene Garcia.

83.     Ms. Dieterich had been dealing primarily with Ms. Ungaro throughout the course of her leave of absence.

84.     On November 12, 2015, Ms. Dieterich received a certified letter from the City of Boulder titled "Termination of Employment," which purported to terminate her employment because she allegedly did not submit a medical certification/leave request form. However, Ms. Dieterich had submitted the appropriate forms to Ms. Ungaro two weeks earlier.

85.     Ms. Dieterich was shocked when she received this letter and immediately emailed her temporary supervisor, Keri Davies, at the City of Boulder Parks and Recreation on November 12, 2015 to notify her that she had indeed provided her forms to Ms. Ungaro. Ms. Dieterich forwarded the original email with the Leave of Absence (LOA) attachment.

86.     The City of Boulder subsequently rescinded Ms. Dieterich's termination notice after receiving communication from Ms. Dieterich's attorney.

87.     Ms. Dieterich's performance reviews prior to telling Ms. Bowden about her marriage were overwhelmingly positive. She had an excellent reputation and often received performance bonuses.

88. In early 2016, Ms. Dieterich discovered that Kady Doelling had completed a 2015 performance review for her without Ms. Dieterich's knowledge or input. The review includes negative comments about Ms. Dieterich's posture and body language. Ms. Dieterich had never been criticized for either of these things prior to Ms. Bowden's directorship.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended)

89. The foregoing allegations are realleged and incorporated herein by reference.

90. The City of Boulder subjected Plaintiff to different terms and conditions of her employment based on her sex, sexual orientation, and failure to conform to stereotypical gender roles, including by: subjecting her to sufficiently severe or pervasive harassment so as to alter the conditions and terms of her employment; condoning or tolerating such harassment; subjecting her to less favorable terms and conditions of employment including, but not limited to, harassing her, altering her job duties and work location, falsely placing her on a leave of absence for an alleged violation of city policy, placing restrictions on her sick time, and attempting to terminate her employment.

91. The City of Boulder was motivated to discriminate against Plaintiff, in part, by its attitudes about gender, sexual orientation, and gender roles.

92. The City of Boulder's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

93. As a direct and proximate result of The City of Boulder's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses,

and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended)

94. The foregoing allegations are realleged and incorporated herein by reference.

95. Plaintiff participated in statutorily protected activity by opposing practices targeted at her that were unlawful under Title VII, including discrimination and harassment based on sex.

96. As a result of Plaintiff's protected opposition to discrimination and harassment, The City of Boulder retaliated against her by subjecting her to the different terms and conditions of employment as described in this Complaint, including stripping her of her job title, placing her nameplate in her mailbox when she was still an active employee, harassing her, and attempting to terminate her during her medical leave by claiming that a form was not received when Plaintiff had already sent it.

97. The City of Boulder's actions taken against Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

98. The City of Boulder's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

99. As a direct and proximate result of The City of Boulder's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### THIRD CLAIM FOR RELIEF
(Sexual Orientation Discrimination in violation of the Colorado Anti-Discrimination Act, as amended)

100. The foregoing allegations are realleged and incorporated herein by reference.

101. The City of Boulder subjected Plaintiff to different terms and conditions of her employment based on sexual orientation, including by: subjecting her to sufficiently severe or pervasive harassment based on her sexual orientation so as to alter the conditions and terms of her employment; condoning or tolerating such harassment; subjecting her to less favorable terms and conditions of employment including, but not limited to, harassing her, altering her job duties and work location, falsely placing her on a leave of absence for an alleged violation of city policy, placing restrictions on her sick time, and attempting to terminate her.

102. The City of Boulder's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

103. The City of Boulder's conduct discriminated against Plaintiff on the basis of her sexual orientation in violation of the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. §§24-34-401.

104. As a direct and proximate result of The City of Boulder's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### FOURTH CLAIM FOR RELIEF
(Retaliation in violation of the Colorado Anti-Discrimination Act, as amended)

105. The foregoing allegations are realleged and incorporated herein by reference.

106. Plaintiff participated in statutorily protected activity by opposing practices targeted at her that were unlawful under the Colorado Antidiscrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-401 and 402, including discrimination and harassment based on sex.

107. As a result of Plaintiff's protected opposition to discrimination and harassment, The City of Boulder retaliated against her by subjecting her to the different terms and conditions of employment as described in this Complaint, including stripping her of her job title, placing her nameplate in her mailbox when she was still an active employee, harassing her, and attempting to terminate her.

108. The City of Boulder's actions taken against Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

109. As a direct and proximate result of The City of Boulder's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff Sally Dieterich respectfully requests that this Court enter judgment in her favor and against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B. Restoration of leave;

C. Injunctive and/or declaratory relief;

D. Attorney fees and costs of the action, including expert witness fees, as

appropriate;

      E.      Pre-judgment and post-judgment interest at the highest lawful rate; and

      F.      Such further relief as justice allows.

Respectfully submitted March 7, 2016.

      By:    SWEENEY & BECHTOLD, LLC

                s/Charlotte N. Sweeney
                650 S. Cherry St., Ste. 610
                Denver, CO 80246
                Telephone: (303) 865-3773
                Fax: (303) 865-3738
                E-mail: cnsweeney@sweeneybechtold.com

                ATTORNEY FOR PLAINTIFF

Plaintiff's Address:
P.O. Box 87
Hygiene, CO 80533

**CERTIFICATION OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.

                By:    SWEENEY & BECHTOLD, LLC

                          s/Charlotte N. Sweeney
                          650 S. Cherry St., Ste. 610
                          Denver, CO 80246
                          Telephone: (303) 865-3773
                          Fax: (303) 865-3738
                          E-mail: cnsweeney@sweeneybechtold.com

                          ATTORNEY FOR PLAINTIFF